## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JENNIFER JOHNSON**, | |
| *Plaintiff,* | |
| **v.** | Case No. 1:23-cv-02944 (RCL) |
| **ACB IDEAS, LLC**, | |
| *Defendant.* | |

## <u>MEMORANDUM OPINION</u>

Before the Court in this employment dispute is defendant ACB Ideas, LLC's motion to compel arbitration and to stay proceedings pending the outcome of arbitration. Plaintiff Jennifer Johnson opposes the motion. She contends first that ACB's motion must be denied for failure to comply with Local Civil Rule 7(m); second, that no valid agreement to arbitrate exists between ACB and her; and third, that even if such an agreement exists, it is for the Court rather than an arbitrator to determine the threshold matters of arbitrability in this dispute (e.g., whether her claims fall within the ambit of the independent contractor agreement's arbitration clause). ACB argues first that it complied with Rule 7(m), or alternatively that the motion should not be denied for failure to comply; second, that Johnson is bound by the independent contractor agreement on which her name appears; and third, that the parties have delegated arbitrability determinations to the arbitrator by agreeing to arbitration before Judicial Arbitration and Mediation Services ("JAMS"), the rules of which assign arbitrability decisions to the arbitrators themselves. The Court agrees with the defendant, and accordingly will **GRANT** the motion to compel arbitration and stay the proceedings.

## I.  BACKGROUND

### A.  Factual & Procedural Background

Johnson, a citizen of the District of Columbia, is a public relations professional and the founder of a company called Phillips Public Relations ("Phillips PR"), which also does business as Red Light Public Relations ("Red Light").  Opp'n 5, ECF No. 8; *see also id.*, Ex. B (showing that Johnson had registered "Red Light Public Relations" as a DBA from 2006 to 2011).  In June of 2022, Johnson executed an Independent Contractor Agreement (the "Agreement") with ACB, a Virginia limited liability corporation, according to which Phillips PR would manage ACB's social media marketing, distribute a newsletter on ACB's behalf, and publicize events related to ACB's release of a book.  Compl. ¶ 20, ECF No. 1-1; Opp'n 5–6; Indep. Contractor Agreement 10, Mot. to Compel Arbitration and Stay Ex. E, ECF No. 4-5.  The parties dispute the identity of ACB's counterparty in this Agreement.  Johnson's signature appears on the Agreement's signature page, identifying her as the CEO of Phillips PR.  Indep. Contractor Agreement 9.  The same page also lists "Phillips PR, Inc." as the contractor.  *Id.*  However, the signature page is the only part of the Agreement that contains a reference to Phillips PR.  In contrast, the preamble to the agreement names the contractor as "Red Light PR", the scope of work appendix refers only to "RLPR," and Johnson's email domain appears on the signature page as "@redlightpr.com."  *Id.* at 2, 9, 10.

The Agreement contains an arbitration clause, which provides that "[a]ny controversy, claim or dispute arising out of, in connection with, or by reason of this Operating Agreement shall be resolved by confidential binding arbitration before Judicial Arbitration and Mediation Service ("JAMS"), pursuant to the Federal Arbitration Act (9 U.S.C. § 1, et seq.)."  Indep. Contractor Agreement 6–7.  It also contains a District of Columbia choice of law provision.  *Id.* at 7.

Johnson alleges that in October of 2022, acting in her personal capacity, she formed a separate oral employment agreement between herself and ACB, according to which Johnson would

serve as ACB's Chief of Staff.  Compl. ¶ 30.  If this agreement ever existed, it was never reduced

to writing.  Opp'n 6.  Johnson avers that she worked as ACB's Chief of Staff pursuant to this oral

contract from October 2022 until December 2022, but received no payment during that time.  *Id.*

Johnson claims that she performed functions not contemplated by the Independent Contractor

Agreement, including "fix[ing] the company's financials, operations, and policies."  Compl. ¶ 5.

She further alleges that she discovered various violations of the D.C. Labor Code while serving as

ACB's Chief of Staff, to wit, that ACB was misclassifying several employees as independent

contractors in order to dodge wage regulations and avoid paying employee benefits and taxes. *Id.*

¶ 33.  Johnson alleges that ACB terminated another employee for complaining about being

misclassified as an independent contractor.  Opp'n 6.  When Johnson complained about ACB's

treatment of that employee and herself, ACB allegedly constructively terminated Johnson by

telling her that her compensation going forward would be substantially less than what they had

agreed to, and that ACB would not pay her for the work she had already performed.  Compl. ¶ 49.

Johnson resigned and filed this lawsuit, alleging that ACB violated the DC Labor Code's

provisions on minimum wage, wage theft, taxes and benefits, breached their oral employment

contract, committed wrongful constructive discharge and retaliation, and intentionally inflicted

emotion distress upon her.

Johnson filed her complaint in D.C. Superior Court in September 2023.  The following

month, ACB removed the case to this Court.  28 U.S.C. §1441(a); Notice of Removal 1–4, ECF

No. 1.  ACB moved one week later to compel arbitration and stay the proceedings, arguing that

the Agreement's arbitration clause commits the determination of both arbitrability and the merits

of Johnson's claims to the arbitrator.  *See generally* Mot. to Compel Arbitration and Stay, ECF

No. 4.  Johnson opposes this motion, arguing first that ACB failed to comply with Local Civil Rule

7(m) when filing its motion, Opp'n 7–10; second, that Johnson herself is not a party to, and therefore not bound by, the arbitration agreement between her public relations firm and ACB, *id.* at 10–14; and third, that even if she is bound by the agreement, the arbitration clause does not delegate the threshold determination of arbitrability to the arbitrator, *id.* at 17–19.

## II. LEGAL STANDARD

### A. Local Rule 7(m)

Local Civil Rule 7(m) "imposes twin duties of consultation and certification" for any party intending to file a nondispositive motion. *Steele v. United States*, No. 1:14-cv-1523-RCL, 2023 WL 6215790, at *3 (D.D.C. Sept. 25, 2023). Specifically, the moving party must meet and confer with opposing counsel "in a good faith effort to determine whether there is any opposition to the relief sought and . . . to narrow the areas of disagreement." LCvR 7(m). Further, the moving party must append to its motion "a statement that the required discussion occurred, and a statement as to whether the motion is opposed." *Id.*

By its own terms, Rule 7(m) applies only to nondispositive motions. *See Campaign Legal Ctr. v. Iowa Values*, No. 1:21-cv-389-RCL, 2024 WL 81278, at *6 (D.D.C. Jan. 8, 2024) ("The threshold question for Local Civil Rule 7(m) is whether the motion in question is 'nondispositive.'"). The D.C. Circuit has defined a dispositive motion as one that, "if granted, would result either in the determination of a particular claim on the merits or elimination of such a claim from the case." *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1215 (D.C. Cir. 1997).

"If Local Rule 7(m) has been violated, that is not the end of the analysis. Breach raises the further question of remedy." *Steele*, 2023 WL 6215790, at *3 (D.D.C. Sept. 25, 2023). To be sure, a litigant's "violation of Local Civil Rule 7(m) is, on its own, reason to deny their motion." *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 316 F. Supp. 3d 22, 24 (D.D.C.

2018).  Courts in this district have the discretion to deny, and often have denied, nondispositive motions solely for failure to comply with Rule 7(m).  *See, e.g., Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 102 (D.D.C. 2006) (denying discovery motions that did not satisfy Rule 7(m)); *Andrades v. Holder*, 286 F.R.D. 64, 65 n.2 (D.D.C. 2012) (denying a request to file a surreply for noncompliance with Rule 7(m)).  However, under certain circumstances, a court may exercise its discretion to entertain a motion that fails to comply with the Rule.  For example, a court may elect to consider the merits of a noncompliant motion if it is evident that "the parties would have proceeded with the exact same disputes regardless of efforts to comply with the rule," *United States ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 19 n.3 (D.D.C. 2011), and therefore enforcing the Rule would "merely lengthen the litigation process and increase costs to the parties," *Escamilla v. Nuyen*, No. 14-cv-00852-AK, 2015 WL 4245868, at *4 (D.D.C. 2015).

### B.  Arbitration and Delegation of Arbitrability

The Federal Arbitration Act, 9 U.S.C. § 2, creates a strong presumption in favor of arbitration when arbitrability is in dispute.  *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . .").  However, because parties can only be forced to submit to arbitration by their own agreement, "it is for the courts to decide whether the parties are bound by a given arbitration clause." *Stromberg Sheet Metal Works, Inc. v. Wash. Gas Energy Sys., Inc.*, 448 F. Supp. 2d 64, 67 (D.D.C. 2006) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).

A district court considering a motion to compel arbitration therefore engages in a "two-part inquiry."  *Stromberg*, 448 F. Supp. 2d at 68.  "First, the court must decide whether the parties entered into a valid and enforceable arbitration agreement." *Id.* (citing *Nur v. K.F.C. USA, Inc.*,

142 F. Supp. 2d 48, 50–51 (D.D.C. 2001)).  If, as here, the non-moving party argues that the parties did not enter into an agreement to arbitrate, the Court must decide whether there was a "meeting of the minds on the agreement to arbitrate," *id.*, applying "the same standard of review that governs Rule 56 [summary judgment] motions."  *Brown v. Dorsey & Whitney, LLP*, 267 F. Supp. 2d 61, 67 (D.D.C. 2003).  In other words, "[t]he party seeking to compel arbitration must 'present evidence sufficient to demonstrate an enforceable agreement to arbitrate.'  The burden then shifts to plaintiffs to show that there is a genuine issue of material fact as to the making of the agreement." *Haire v. Smith, Currie & Hancock LLP*, 925 F. Supp. 2d 126, 129 (D.D.C. 2013) (quoting *Hill v. Wackenhut Servs. Int'l*, 865 F. Supp. 2d 84, 89 (D.D.C. 2012) (internal quotations omitted)).  "The Court will compel arbitration if the pleadings and the evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Fox v. Computer World Servs. Corp.*, 920 F. Supp. 2d 90, 96 (D.D.C. 2013) (internal quotations omitted).

Provided the court decides that a valid arbitration agreement exists between the parties, the usual second step is to "determine whether the arbitration agreement encompasses the claims raised in the complaint."  *Stromberg*, 448 F. Supp. 2d at 68 (citing *Nur*, 142 F. Supp. 2d at 51). While the "default rule" is that "the question of arbitrability is usually for the Court to decide," *Haire*, 925 F. Supp. 2d at 132, the parties can "agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). When analyzing whether the Court itself or an arbitrator is to decide the threshold question of arbitrability, the usual presumption in favor of arbitration is inverted: courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that

they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations and alterations omitted).   The D.C. Circuit has held that "the requisite clear and unmistakable delegation occurs when the parties' agreement incorporates arbitral rules that in turn assign questions of arbitrability to the arbitrator." *Commc'ns Workers of Am. v. AT&T, Inc.*, 6 F.4th 1344, 1347 (D.C. Cir. 2021).

## III. ANALYSIS

### A.  Local Civil Rule 7(m)

The Court declines to deny ACB's motion for noncompliance with Local Rule 7(m).  Even if a motion to compel arbitration is a nondispositive motion within the scope of Rule 7(m), in which case ACB failed to meet both the requirement to confer and to certify, the Court would exercise its discretion to proceed to the merits of this dispute in the interest of judicial economy.

If Local Rule 7(m) does indeed apply to this dispute, ACB failed to comply.  Johnson claims that ACB violated the Rule by failing even to attempt to confer with her about its proposed motion and by neglecting to certify compliance with the Rule in its filing.  Opp'n 8–9.  In defense, ACB has proffered an email exchange between the parties in which it states its intentions to move to compel arbitration, which Johnson's counsel acknowledges.  Reply Ex. A, ECF No. 11-1.  This perfunctory asynchronous exchange of information does not meet the Rule's demand that the parties convene in a serious attempt to "narrow the areas of disagreement."  LCvR 7(m); *see also GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 194 (D.D.C 2003) (stating that the Rule "contemplates that counsel will speak to each other").  ACB's argument that the email exchange gave Johnson adequate notice to request a meeting if she so desired misses the point: Local Rule 7(m) does not place the onus on the non-movant to demand a meeting.  Moreover, ACB also self-evidently failed to comply with the Rule's certification requirement. *See generally* Mot. to Compel Arbitration and Stay, ECF No. 4.

Whether Local Rule 7(m) applies to this dispute in the first place depends on whether a motion to compel arbitration is a dispositive motion. Johnson contends that a motion to compel arbitration is "plainly nondispositive" because it does not seek final resolution of the merits of any claim. Opp'n 8. The D.C. Circuit has not opined directly on this issue, and other courts have expressed divergent views.[1]

However, the Court need not resolve this issue today because, even assuming that a motion to compel arbitration is a non-dispositive motion—and thereby subject to Rule 7(m)—the Court would not deny ACB's motion for noncompliance with the Rule under the particular circumstances of this case. The parties' briefs reflect irreconcilable differences of opinion as to the scope and content of the Agreement between them. If ACB's motion were denied for failure to comply with Rule 7(m), "it is practically certain that defendant will refile precisely the same motion." *Kriebel v. Life Ins. Co. of N. Am.*, No. 1:15-cv-00151-TSC/GMH, 2015 WL 11347968, at *3 (D.D.C. Oct. 14, 2015). Nor does the email exchange between the parties suggest a bad faith effort to elide the Rule. *Cf. United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 51–52 (D.D.C. 2006) (denying a motion which the movant had threatened to file on 24 hours' notice as a "mere[] genuflect[ion] to the letter of the Rule" rather than an attempt "in good faith to achieve its objectives"). This dispute therefore presents an especially compelling case for reaching the merits despite ACB's possible breach of Rule 7(m). While ACB is admonished to be mindful

---

[1] *Compare, e.g.*, *Patton v. Johnson*, 915 F.3d 827, 832 (1st Cir. 2019) (holding that motions to compel arbitration are non-dispositive), *Virgin Islands Water and Power Auth. v. Gen. Elec. Int'l Inc.*, 561 Fed. App'x 131, 134 (3d Cir. 2014) (same), *Carillo v. ROICOM USA, LLC*, 486 F. Supp. 3d 1052, 1060 (W.D. Tex. 2020) ("[A]ll four federal judicial districts in Texas have held motions to compel arbitration to be non-dispositive matters."), *and Herko v. Metro. Life Ins. Co.*, 978 F. Supp. 141, 142 n.1 (W.D.N.Y. 1997) (holding that a motion to compel arbitration is nondispositive because "there is no final exercise of Article III power until . . . the arbitrator's decision is either affirmed, modified, or vacated by the district court"), *with Zeiger v. Hotel Cal. by the Sea LLC*, No. C21-1702-TL-SKV, 2022 WL 1499670, at *3 (W.D. Wash. May 12, 2022) (holding that motions to compel arbitration are dispositive), *Amisil Holdings Ltd. v. Clarium Capital Mgmt.*, 622 F. Supp. 2d 825, 827 n.1 (N.D. Cal. 2007) (noting the differences among district courts, but ultimately issuing a report and recommendation consistent with a dispositive motion), *and Flannery v. Tri-State Div.*, 402 F. Supp. 2d 819, 821 (E.D. Mich. 2005).

of its obligations under this district's Local Rules, including Rule 7(m), the Court declines to deny this motion for noncompliance in light of the particular facts of this dispute.

### B. Johnson Is Personally Bound to the Arbitration Agreement

The Court also declines to deny ACB's motion on the grounds that Johnson is a non-signatory to the Agreement.  While the Court recognizes that Johnson signed the contract in her representative capacity as CEO of her public relations firm, she is nevertheless bound by it because her public relations firm is her alter ego.

There is no dispute that the Agreement bears Johnson's signature on the signature page. Indep. Contractor Agreement 9.  However, Johnson argues that she signed the Agreement only in her representative capacity as CEO of the public relations firm, and that her employment claims against ACB arise under a separate oral employment contract, to which her firm is not a party and which contains no arbitration provision.  Opp'n 11, 14.

ACB's counterargument that Johnson is necessarily bound by the arbitration clause because she is a "director, officer, employee, and agent of Red Light," Mot. to Compel Arbitration and Stay 6, is meritless.  As a matter of basic agency law, a contract executed by an agent may bind the principal, but the contracts of the principal are not presumptively binding upon the agent. *Peyser v. Am. Sec. & Tr. Co.*, 107 F.2d 625, 626 (D.C. Cir. 1939) ("When an agent contracts in the name of his principal, the principal contracts and is bound, but the agent is not.") (quoting *Taylor v. Mayo*, 110 U.S. 330, 335 (1884)).  And it goes nearly without saying that officers, directors, and shareholders are not, at least by default, bound by the contracts of the corporations which they serve.  *See, e.g.*, *Winston & Strawn LLP v. McLean*, No. 13-cv-524-EGS, 2018 WL 5281904, at *2 (D.D.C. Oct. 24, 2018) ("[A] corporation is treated as separate and distinct from

its owner, even if it is wholly owned by one individual or entity.  Consequently, a plaintiff attempting to hold an individual liable for the actions or obligations of a corporation must establish that there is some reason to disregard the corporate form.") (internal citations omitted).

However, "a nonsignatory to an arbitration agreement may be bound by that agreement under traditional principles of contract and agency law."  *Oehme, Van Sweden & Assocs. v. Maypaul Trading & Servs. Ltd.*, 902 F. Supp. 2d 87, 97 (D.D.C. 2012).  One such "traditional principle[]" is "piercing the corporate veil," or "alter ego" theory.  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009).  Under D.C. law, "Courts apply the 'alter ego' theory to 'cast aside the corporate shield' . . . when substantial ownership of corporate stock is concentrated in one person or a few persons and other factors support disregarding the corporate entity in the interest of equity and fairness."  *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Hotelco, C.A.*, 342 F. Supp. 3d 1, 12 (D.D.C. 2018) (citing *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 470 (D.C. 2008)).  This theory thus calls for a two-part inquiry.  The first part asks whether the owner exercises such a degree of ownership and control that "the corporation is, in reality, . . . '[a] business conduit of the person in control.'"  *Lawlor v. Dist. of Columbia*, 758 A.2d 964, 975 (D.C. 2000) (quoting *Labadie Coal Co. v. Black*, 617 F.2d 92, 97 (D.C. Cir. 1982)).   The second part asks whether "considerations of justice and equity" favor disregarding the corporate form, such as the "degree of legitimacy [that] exists for those claiming" its "protection."  *Vuitch v. Furr*, 482 A.2d 811, 815–16 (D.C. 1984).  Although the second part of the analysis may be satisfied by a demonstration that the owner of a corporation is wielding the corporate form in bad faith, such a showing is not required: D.C. courts have "rejected the contention that in order to pierce the corporate veil there must be a showing of fraud 'directly tainting the obligation on which the plaintiff is suing.'"  *Id.* at 815 (quoting *Harris v. Wagshal*, 343 A.2d 283, 287 (D.C. 1975)).

The undisputed facts proffered by ACB demonstrate that Johnson exercises the requisite ownership and control over her public relations firm for it to be considered her alter ego.  Johnson served as CEO, Secretary, Chief Financial Officer and sole director of the company, with which she also shared an address.  Statement of Info., Mot. to Compel Arbitration and Stay Ex. C, ECF No. 4-3; Certificate of Dissolution, Mot. to Compel Arbitration and Stay Ex. D, ECF No. 4-4. Johnson also allowed her registration of the DBA name "Red Light Public Relations" to lapse in 2011, but continued doing business under that name.  Business Registration Record, Mot. to Compel Arbitration and Stay Ex. B, ECF No. 4-2.  This nonobservance of formalities further illustrates the slender corporate barrier between the company and Johnson herself.  *See TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 67 (D.D.C. 2011) (citing *Mitchell*, 947 A.2d at 470–71).  Finally, Johnson's own complaint suggests that she and her firm are essentially one entity.  For example, Johnson claims that her chief-of-staff work for ACB would require her to "mak[e] ACB Ideas her main focus" and be "absent[t]" from Red Light, Compl. ¶¶ 27, 34, but simultaneously states that she was "reorient[ing]" Red Light to "focus on ACB Ideas." *Id.* at 47.  Taken together, these passages depict Johnson reducing *her own* focus on Red Light's other clients in order to devote more of *her own* energy to ACB.  Johnson's time is Red Light's time because Johnson is Red Light.

"Considerations of justice and equity" also point to the conclusion that Johnson's firm is her alter ego.  Suppose the Court were to credit Johnson's argument that she is not personally bound by the arbitration agreement which she executed on behalf of her company (with which, to reiterate, she evidently shares a complete unity of identity and interest).  This holding would enable any single-member LLC, acting in bad faith, to skirt their arbitration agreements simply by claiming to sue in their personal capacity, perhaps—as in this case—pursuant to some notional

unwritten collateral agreement conveniently lacking an arbitration clause.  The result would be a grave subversion of Congress's "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), and an erosion of the essential reliability of contracts that undergirds our commercial system.  While the Court does not impute such a bad faith motive to Johnson, the Court declines to issue a holding that would open this Pandora's box.  "Superman cannot escape his debts . . . by putting on Clark Kent's glasses."  *Boland v. Thermal Specialties, Inc.*, 950 F. Supp. 2d 146, 147 (D.D.C. 2013).

Johnson does not dispute the veracity of the evidence tending to establish an alter ego relationship between herself and her firm.  Instead, Johnson avers that a separate oral contract governs her dispute with ACB, but adduces no independent proof of this contract's existence whatsoever.  It bears repeating that motions to compel arbitration are evaluated under the same standard as summary judgment motions, which requires non-movants to establish more than a mere "scintilla of evidence in support" of their position, *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986), and which a moving party may satisfy "[b]y pointing to the absence of evidence proffered by the non-moving party."  *Prince v. Rice*, 570 F. Supp. 2d 123, 130 (D.D.C. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Even though Johnson claims the existence of an unwritten employment contract, one would expect some modicum of evidence—a text message, an email, an affidavit from a non-litigant—attesting to her alleged employment with ACB (which, after all, allegedly consumed 60 hours of work per week for at least two months, Compl. ¶ 9).  Yet the only evidence appearing in the record is Johnson's own declaration. Declaration, Opp'n Ex. 1, ECF No. 8-1.  Just as "[c]onclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary

judgment," *Mason v. Geithner*, 811 F. Supp. 2d 128, 174 (D.D.C. 2011), Johnson's unsubstantiated avowal of a collateral employment contract cannot survive ACB's motion to compel arbitration.

Johnson cites *Camara v. Mastro's Restaurants LLC*, 952 F.3d 372 (D.C. Cir. 2020), in support of her argument that she has raised a genuine issue of material fact as to whether she is bound by the Independent Contractor Agreement or by the alleged unwritten contract. In *Camara*, the plaintiff opposing a motion to compel arbitration submitted an affidavit claiming that he was presented with, but did not sign, the defendant's standard employee arbitration agreement. *Id.* at 375. His employer could not produce an arbitration agreement containing his signature, and offered only affidavits in support of its position that he had in fact signed the agreement. *Id.* The D.C. Circuit held that the plaintiff's declaration was "sufficient to create a genuine dispute about whether he agreed to be bound by the company's arbitration policy" because "[t]here is not much more that Camara could reasonably be expected to assert in opposing [the defendant's] motion. The summary judgment standard does not require him to prove a negative." *Id.*

But Johnson's dispute is distinguishable from *Camara* in two critical respects. First, ACB has adduced far stronger evidence than the defendant in *Camara*, including an arbitration agreement bearing Johnson's signature and business records suggesting a *de facto* unity between Johnson and her firm. Second, unlike *Camara*, Johnson is not being asked to "prove a negative": she is affirmatively claiming that a separate but unwritten agreement containing no arbitration clause governs her claims against ACB. Even under the summary judgment standard that governs motions to compel arbitration, claims of this sort require more than a party's say-so. *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) ("[P]arty assertions 'so conclusory' as to put a jury in 'no position to assess' whether they are based in fact will not suffice.") (quoting *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)). Indeed, courts in this district routinely grant

summary judgment in employment disputes where the plaintiff's claims rest predominantly or entirely on the plaintiff's uncorroborated factual assertions. *See, e.g.*, *Prince*, 570 F. Supp. 2d at 133–34 (granting summary judgment for defendant because, "beyond [plaintiff's] bare assertions, there is no evidence whatsoever" supporting the plaintiff's claims of non-promotion and retaliation based on race); *Musgrove v. Gov't of D.C.*, 775 F. Supp. 2d 158, 170 (D.D.C. 2011) (granting summary judgment for defendant in a sex discrimination suit because plaintiff's allegation that similarly situated employees of the opposite sex not been terminated lacked "any evidence . . . other than her own deposition testimony").

ACB has made a sufficient showing that Johnson's PR firm is her alter ego, whereas Johnson has neither challenged ACB's evidence, nor adduced adequate proof of her own to raise a genuine factual dispute as to whether her claims are governed by a separate oral employment contract. This evidentiary imbalance, coupled with the systemic interests at stake, compel the conclusion that Johnson's public relations firm is her alter ego, and that she is therefore bound in this dispute by the Independent Contractor Agreement and its arbitration clause.

## C. Arbitration of Arbitrability

Having decided that a valid agreement to arbitrate exists between Johnson and ACB, the next inquiry is whether it is for the Court or the arbitrator to determine whether Johnson's claims fall within the Agreement's scope. The Court concludes that the plain language of the Agreement, the parties' selection of JAMS as the arbitral forum, and the breadth of the arbitration clause cumulatively evince the parties' clear and unmistakable intent to delegate arbitrability decisions to the arbitrator.

First, the Court looks to the plain wording of the Agreement, which calls for arbitration "before . . . JAMS," Indep. Contractor Agreement 5. In context, this phrase constitutes powerful

evidence that the parties intended to delegate the question of arbitrability to the arbitrator.  When one appears "before" a given forum, it is commonly understood that the rules of that forum will be in operation.  For example, one asked to appear before this Court or forced to testify before Congress could not feign surprise when the rules of each respective forum govern their appearance. Equally important is what the arbitration clause does *not* say: it gestures to no source of rules other than JAMS.[2]  Arbitration requires rules, and an ordinary reading of this arbitration clause suggests that JAMS will furnish them.

Second, the Court looks to the content of the JAMS rules themselves for further clues of the parties' intentions.  Unlike some other arbitral fora, the JAMS rule governing jurisdictional and arbitrability disputes contains mandatory language requiring—not just allowing—the arbitrator to resolve arbitrability disputes.  *Compare* JAMS Rules 11 ("Jurisdictional and arbitrability disputes . . . *shall* be submitted to and ruled on by the arbitrator") (emphasis added) *with* AAA Rules R-7(a) ("The arbitrator shall *have the power* to rule on his or her own jurisdiction.") (emphasis added).  Thus, by agreeing to arbitration "before JAMS," the parties assented to a framework which strongly favors, if not requires, delegation of arbitrability decisions to the arbitrator.  *See In re: Zetia (Ezetimibe) Antitrust Litig.*, MDL No. 2:18md2836, 2018 WL 4677830, at * 6 (E.D. Va. Sept. 6, 2018) (finding it significant that the JAMS rules contain a mandatory delegation of arbitrability to the arbitrator), *report and recommendation adopted*, 2018 WL 6795836 (E.D. Va. Dec. 6, 2018).

---

[2] While the arbitration clause provides that arbitration will be conducted "pursuant to the Federal Arbitration Act," it is well-established that "[t]he procedures to be used in an arbitration are not prescribed by the federal act." *Southland Corp. v. Keating*, 465 U.S. 1, 11 n.6 (1984); *Ruiz v. Millenium Square Residential Ass'n*, 156 F. Supp. 3d 176, 184 n.2 (D.D.C. 2016) ("[T]he FAA says little about arbitration procedure"); 2 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 3569 (3d ed. June 2024 update) (noting that, aside from prescribing rules for certain unusual circumstances such as where a party uses undue means to procure an arbitral award, "the Federal Arbitration Act does not regulate arbitration procedure").

Finally, the Court observes that the language of the arbitration clause is quite broad, covering "[a]ny controversy, claim or dispute arising out of, in connection with, or by reason of this Operating Agreement."  Indep. Contractor Agreement 5.  Courts in this district have held that arbitration clauses containing sweeping language such as "arising out of" evince the parties' intent to submit arbitrability questions to the arbitrator.  *See, e.g.*, *Invista N. Am., S.A.R.L. v. Rhodia Polyamide Intermediates S.A.S.*, 503 F. Supp. 2d 195, 206 (D.D.C. 2007) ("[I]n light of . . . the federal policy in favor of arbitration, this Court holds that 'arising out of' creates a broad arbitration agreement."); *Sakyi v. Estée Lauder Cos., Inc.*, 308 F. Supp. 3d 366, 378 (D.D.C. 2018) (noting that an arbitration clause's "'broad, all-encompassing language' is 'clear evidence that the parties agreed to arbitrate all issues' arising between them, including the question of arbitrability") (quoting *W & T Travel Servs., LLC v. Priority One Servs., Inc.* 69 F. Supp. 3d 158, 167 (D.D.C. 2014)).

Johnson points out in response that, when courts in this district have interpreted arbitration clauses to delegate arbitrability determinations to the arbitrator, those clauses have contained language expressly "incorporating" the chosen arbitral forum's "rules," rather than merely calling for arbitration "before" that forum.  *Cf. Commc'ns. Workers of Am.*, 6 F.4th at 1346–47 ("[O]ur circuit precedent compels concluding that an arbitration agreement's *incorporation* of the AAA *rules* constitutes an assignment of the question of arbitrability . . . to the arbitrator.") (emphasis added); *Grynberg v. BP P.L.C.*, 585 F. Supp. 2d 50, 54–55 (D.D.C. 2008) (holding that a provision for "arbitration pursuant to the Commercial Arbitration Rules . . . of the American Arbitration Association" constituted "clear and unmistakable" evidence of the parties' intent to delegate arbitrability questions to the arbitrator); *see also Mercadante v. XE Servs., LLC*, 78 F. Supp. 3d 131, 139 (D.D.C. 2015) (collecting cases).  Thus, she contends that this Agreement, unlike others,

merely specifies which arbitral forum the parties *would* use in the event of an arbitration, leaving the predicate question of arbitrability for the Court to determine. Opp'n 17–19.

Johnson's position asks this Court to draw too fine a distinction. Even if Johnson is correct that other arbitration clauses that have appeared before courts in this district contained the words "incorporate" and "rules," it simply does not follow that such language is *necessary* to constitute clear and unmistakable evidence of the parties' intent to assign arbitrability determinations to the arbitrator. The Court holds that the Agreement's plain wording, reference to a sole arbitral forum the rules of which mandate arbitration of arbitrability, and sweeping language collectively leave no doubt as to the parties' intent to arbitrate threshold matters of arbitrability.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that a valid arbitration agreement exists between Johnson and ACB. The Court further finds that the parties have delegated threshold questions of arbitrability, such as whether Johnson's employment claims arise out of the independent contractor agreement, to a JAMS arbitrator for decision. Accordingly, the Court will **GRANT** ACB's motion [4] to compel arbitration and stay proceedings and will **ORDER** the parties to arbitrate all claims asserted in Johnson's complaint. A separate Order shall issue.

Date: June 28, 2024

Royce C. Lamberth
United States District Judge